## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

MICHIGAN MEDICINE d/b/a University Of
Michigan Hospitals & Health Centers
1500 E. Medical Center Drive
Ann Arbor, MI 48109,

*Plaintiff*,

v.

ROBERT F. KENNEDY JR.
Secretary of the United States Department of
Health and Human Services
200 Independence Avenue, S.W.
Washington, DC 20201,

*Defendant*.

Case No. 1:26-cv-2456

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE MEDICARE ACT

## INTRODUCTION

1.　　This is a civil action brought to obtain judicial review of an agency decision regarding Medicare reimbursements rendered by Robert F. Kennedy Jr. (the "Secretary" or "Defendant"), in his official capacity as the Secretary of the United States Department of Health and Human Services ("HHS"). Plaintiff seeks reversal of the Secretary's decision. A reversal would require the Secretary's Provider Reimbursement Review Board (the "Board") to take jurisdiction over Plaintiff's appeal of its Medicare payments for direct graduate medical education ("DGME") during Plaintiff's fiscal year ending June 30, 2012 ("FY 2012").

2.　　Plaintiff, Michigan Medicine, doing business as University of Michigan Hospitals & Health Centers, operates an acute care hospital that participates in the Medicare program.

Michigan Medicine operates approved medical training programs for physician interns, residents, and fellows (collectively "residents"). Michigan Medicine receives Medicare DGME payments.

3.    Medicare also makes an additional payment to hospitals that receive reimbursement for nursing and allied health programs and that treat patients enrolled in Medicare Advantage ("MA"), which is an optional managed care plan. 42 U.S.C. § 1395ww(l). The Secretary is required to reduce DGME payments to offset these nursing and allied health MA payments. In FY 2012, the Secretary calculated an incorrect reduction percentage that it applied to all DGME payments, including Michigan Medicine's. The Secretary subsequently published corrected reduction factors and conceded that the percentage applied in FY 2012 was contrary to the statute.

4.    Michigan Medicine was a plaintiff in prior litigation concerning the DGME payment. *See Milton S. Hershey Med. Ctr. v. Becerra*, No. 19-2680, 2021 WL 1966572 (D.D.C. May 17, 2021). In *Hershey*, this Court held that the Secretary's methodology for computing DGME payments for hospitals that exceed a statutory cap on the number of residents was unlawful and ordered the Secretary to recalculate the plaintiffs' DGME payments.

5.    On remand following *Hershey*, a Medicare Administrative Contractor ("MAC") reopened Michigan Medicine's FY 2012 Medicare cost report to revise the DGME payment and issued a Revised Notice of Program Reimbursement ("RNPR"). The MAC did not, however, update all lines of the cost report that were necessary to correct Michigan Medicine's DGME payments. The MAC improperly applied the outdated and incorrect DGME MA reduction percentage. This reapplication of the adjustment percentage changed the DGME MA reduction, thus underpaying Michigan Medicine.

2

6. Michigan Medicine appealed the FY 2012 RNPR to the Board, challenging the MAC's determination of Michigan Medicine's DGME MA reduction. Michigan Medicine's FY 2012 Board appeal argued that the MAC erred by failing to correctly update the prior-year DGME MA payment percentages.

7. The Board, acting on behalf of the Secretary, held that it did not have jurisdiction over Michigan Medicine's appeal, even though the MAC changed the DGME MA reduction.

8. The Secretary's decision violates the Medicare statute and regulations in effect during the relevant time period, and the Secretary's decision is arbitrary, capricious, an abuse of discretion, not based upon substantial evidence, and otherwise contrary to law. Accordingly, Michigan Medicine asks this Court to reverse the Secretary's decision and reinstate Michigan Medicine's FY 2012 Board appeal.

## JURISDICTION AND VENUE

9. This action arises under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* (2012) (the "Medicare Act"), which establishes the Medicare program, and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* (2017) (the "APA").

10. This Court has jurisdiction under 42 U.S.C. § 1395oo(f)(1), which grants Medicare providers "the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received." The Board's final decision is dated May 13, 2026, and this action is, therefore, timely filed within the 60-day limitations period for judicial review. 42 U.S.C. § 1395oo(f)(1); Fed. R. Civ. P. 6(a)(1)(C).

11. Venue in this Court is proper under 42 U.S.C. § 1395oo(f)(1).

**PARTIES**

12.     Plaintiff Michigan Medicine is an academic medical center located in Ann Arbor, Michigan.  Michigan Medicine participates in the Medicare program and has been assigned Medicare Provider Number 23-0046.  Michigan Medicine operates graduate medical education programs and receives Medicare DGME payments.

13.     Defendant is the Secretary of the Department of Health and Human Services and is the federal officer responsible for administering the Medicare program pursuant to the Social Security Act.  Defendant is sued in his official capacity.

**BACKGROUND**

I.     **The Medicare Program and Payment for Hospital Services**

14.     Medicare is a public health insurance program that furnishes health benefits to participating individuals once they reach the age of 65.  42 U.S.C. § 1395c.  The Secretary has delegated much of the responsibility for administering the Medicare program to the Centers for Medicare and Medicaid Services ("CMS"), which is a component of HHS.

15.     Under the Medicare Act, an eligible Medicare beneficiary is entitled to have payment made by Medicare on his or her behalf for, *inter alia*, inpatient, outpatient, and emergency hospital services provided by a hospital participating in the Medicare program as a provider of health care services.  *Id.*  Inpatient hospital services are paid under Part A of the Medicare Act.  *Id*. § 1395d.  Medicare Part B is a supplemental insurance program that pays for physician, hospital outpatient, and certain other services.  *Id.* § 1395k.  Medicare Part C is an optional managed care program that pays for services that would otherwise be covered under Medicare Parts A and B.  *Id.* §§ 1395w-21–1395w-29.  Medicare Part D is an optional insurance

4

program for prescription drugs.  *Id.* §§ 1395w-101–1395w-154.  This action concerns Medicare Part A.

**II.    Medicare Cost Report Audits and Appeals**

16.    At the close of a hospital's fiscal year, it is required to submit to its designated MAC a "cost report" showing both the costs incurred by the provider during the fiscal year and the appropriate share of these costs to be apportioned to Medicare.  42 C.F.R. § 413.24(f).  During FY 2012, DGME payments were calculated on cost report Worksheet E-4.

17.    The MAC must analyze and audit the cost report and inform the provider of a final determination of the amount of Medicare reimbursement through a Notice of Program Reimbursement ("NPR").  *Id.* § 405.1803(a).  A provider's DGME payments are among the components of the final payment determination reported in the NPR.

18.    A MAC may "reopen" a cost report within three years from the date of the NPR.  *Id.* § 405.1885(a), (b).  If the MAC revises the reopened cost report, it issues an RNPR.

19.    A hospital may appeal a final determination of its Medicare reimbursement to the Board pursuant to 42 U.S.C. § 1395oo(a).  The Board has jurisdiction over appeals from MAC determinations if the following requirements are met:  (1) the hospital is dissatisfied with the final determination; (2) the amount in controversy is at least $10,000; and (3) the hospital requests a hearing within 180 days of receiving the final determination.  *Id.*

20.     Once jurisdiction for an appeal of a final determination is established under subsection (a), then subsection (d) of the statute grants the Board broad authority to decide issues that are related to the provider's cost report.  The statute gives the Board the power to "affirm, modify, or reverse a final determination of the [MAC] with respect to a cost report and to make any other revisions on matters covered by such cost report (including revisions adverse to the

5

provider of services) even though such matters were not considered by the [MAC] in making such final determination." 42 U.S.C. § 1395oo(d).

21. A hospital may appeal an RNPR to the Board. 42 C.F.R. § 405.1889. In 2011, the Secretary issued a regulation limiting an appeal of an RNPR to "[o]nly those matters that are specifically revised in a revised determination or decision." *Id.* § 405.1889(b)(1).

22. The Administrator of CMS, acting on behalf of the Secretary, may, but is not required to, review a Board decision. 42 U.S.C. § 1395oo(f). The CMS Administrator may reverse, affirm, or modify the decision. *Id*.

23. A hospital has the right to obtain judicial review of any final decision of the Board, or any reversal, affirmance, or modification of the Board's decision by the CMS Administrator, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or CMS Administrator is received. *Id.*

### III.   Direct Graduate Medical Education

24. The Medicare statute reimburses hospitals for the direct costs of graduate medical education. *Id*. § 1395ww(h). The DGME payment is calculated by multiplying a hospital's "patient load" times its "approved amount." *Id*. § 1395ww(h)(3)(A). The "patient load" is "the fraction of the total number of inpatient-bed-days . . . during the period which are attributable to patients with respect to whom payment may be made under [Medicare] part A." *Id*. § 1395ww(h)(3)(C). The "approved amount" is the product of a hospital's base-period per-resident amount ("PRA") and its weighted average number of FTE residents. *Id*. § 1395ww(h)(3)(B); 42 C.F.R. § 413.76(a). The weighted average number of FTEs is calculated using the average of "the actual full-time equivalent resident counts for the cost reporting period

and the preceding two cost reporting periods." 42 U.S.C. § 1395ww(h)(4)(G).  The following is the basic formula for calculating a hospital's DGME payment:

**PRA x (3-Year FTE Average) x (Medicare Patient Load) = DGME Payment**

25.     The Medicare statute requires that residents who are training beyond their initial residency period ("IRP") are weighted at 0.5, so that only half their time is counted. *Id.* § 1395ww(h)(4)(C)(iv).  The IRP is defined as the period necessary for board eligibility in the resident's training program, not to exceed five years. *Id.* § 1395ww(h)(5)(F).  Most, though not all, residents who are training beyond the IRP are participating in post-residency fellowship programs.

26.     For cost reporting periods beginning on or after October 1, 1997, Congress established a cap on the number of *unweighted* DGME FTEs that a hospital may count, which is set at each hospital's number of unweighted FTEs during its most recent fiscal year that ended on or before December 31, 1996. *Id.* § 1395ww(h)(4)(F).  Thus, a hospital's three-year FTE average in the DGME formula is limited by the number of unweighted FTEs that the hospital trained in its 1996 cost reporting period.  The FTE cap is determined "before application of weighting factors" based on the IRP. *Id.* § 1395ww(h)(4)(F)(i).

27.     In 1997, the Secretary promulgated an unlawful regulation to implement the 1996 cap that calculates a *weighted* 1996 FTE cap to be used in the payment calculation:

> For purposes of determining direct graduate medical education payment, for cost reporting periods beginning on or after October 1, 1997, a hospital's unweighted FTE count for residents in allopathic and osteopathic medicine may not exceed the hospital's unweighted FTE count for these residents for the most recent cost reporting period ending on or before December 31, 1996. If the hospital's number of FTE residents in a cost reporting period beginning on or after October 1, 1997, exceeds the limit described in this paragraph (g), the hospital's weighted FTE count (before application of the limit) will be reduced in the same proportion that the number of FTE residents for that cost reporting period exceeds the number of

FTE residents for the most recent cost reporting period ending on or before December 31, 1996.

42 C.F.R. § 413.86(g)(4) (1997).

28.     On August 1, 2001, the Secretary amended the regulation to determine separate weighted 1996 FTE caps for primary care residents and non-primary care residents, effective for cost reporting periods beginning on or after October 1, 2001.  42 C.F.R. § 413.86(g)(4)(iii) (2001); Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Rates and Costs of Graduate Medical Education: Fiscal Year 2002 Rates, 66 Fed. Reg. 39,828, 39,893-96 (Aug. 1, 2001) [hereinafter the "FY 2002 IPPS Rule"].  The Secretary did not change the formula for determining the weighted 1996 FTE cap.  Rather, the Secretary used the same methodology as in the 1997 rule to calculate a primary care weighted 1996 FTE cap and a non-primary care weighted 1996 FTE cap, which are then added together to determine an overall cap. 42 C.F.R. § 413.86(g)(4)(iii) (2001); FY 2002 IPPS Rule, 66 Fed. Reg. at 39,894.

29.     In 2004, CMS redesignated the regulation from 42 C.F.R. § 413.86(g)(4)(iii) to 42 C.F.R. § 413.79(c)(2)(iii).  Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2005 Rates, 69 Fed. Reg. 48,916, 49,112, 49,258-64 (Aug. 11, 2004).

30.     The regulation that was in effect when Michigan Medicine filed its FY 2012 cost report states as follows:

> If the hospital's number of FTE residents in a cost reporting period beginning on or after October 1, 2001 exceeds the limit described in this section [i.e., the 1996 unweighted cap], the hospital's weighted FTE count (before application of the limit) for primary care and obstetrics and gynecology residents and nonprimary care residents, respectively, will be reduced in the same proportion that the number of FTE residents for that cost reporting period exceeds the number of FTE residents for the most recent cost reporting period ending on or before December 31, 1996.

42 C.F.R. § 413.79(c)(2)(iii) (2013) ("pre-2022 regulation").

31.     If a hospital's unweighted FTE count exceeded its unweighted FTE cap, the Secretary's pre-2022 regulation at 42 C.F.R. § 413.79(c)(2)(iii) calculated the ratio of a hospital's unweighted FTE cap to the hospital's current-year unweighted FTE count.  *Id*. § 413.79(c)(2)(ii)-(iii) (the "proportion that the number of FTE residents for that cost reporting period exceeds the number of FTE residents for the most recent cost reporting period ending on or before December 31, 1996").  This ratio represented the percentage by which the hospital's unweighted FTE cap is below the current-year unweighted FTE count.  The ratio was then multiplied by the current-year weighted FTE count (both residents within and beyond their IRP) and, thereby, reduced that already weighted FTE count.  *Id.*  The resulting number was the weighted 1996 FTE cap.  The Secretary's methodology is expressed in the following equation:

**(Unweighted FTE Cap)/(Unweighted FTEs) x Weighted FTEs = Weighted FTE Cap.**

32.     The regulation calculated a hospital's DGME payment based on its weighted FTEs, which may not exceed its weighted 1996 FTE cap.  42 C.F.R. §§ 413.76(a), 413.79(c)(2)(iii).

## IV.     *Milton S. Hershey Medical Center v. Becerra*

33.     In *Milton S. Hershey Medical Center v. Becerra*, numerous hospitals challenged CMS's DGME methodology regulation under the pre-2022 regulation at 42 C.F.R. § 413.79(c)(2)(iii).  No. 19-2680, 2021 WL 1966572 (D.D.C. May 17, 2021).  The U.S. District Court for the District of Columbia held "that [the Secretary's] application of the regulation to compute Plaintiffs' full-time equivalent residents was contrary to law because the regulation effectively changed the weighting factors statutorily assigned to residents and fellows." *Hershey*, 2021 WL 1966572, at *1.

34.     The *Hershey* court explained:

> Simply put, the text of the statute does not give the Secretary the latitude to decide, under these conditions, to change the weights that Congress assigned to residents and fellows when he calculates the FTE residents for each hospital. Rather, the statute is clear: the Secretary's rules "shall provide, in calculating the number of [FTE] residents in an approved residency program," that residents be weighted at 1.0 and fellows at 0.5. § 1395ww(h)(4)(C). When Congress uses the word "shall," its language is mandatory or imperative, not merely precatory." *See United States v. Monzel*, 641 F.3d 528, 531 (D.C. Cir. 2011).

*Id.* at *5.

35.    On August 10, 2022, CMS published a final rule, which changed the method for calculating DGME payments following the court's ruling in *Hershey*. Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System and Policy Changes and Fiscal Year 2023 Rates, 87 Fed. Reg. 48,780, 49,066–72 (Aug. 10, 2022) ("FY 2023 Final Rule"). CMS conceded that the then "existing formula for computing the number of FTEs was inconsistent with the statutory requirements," and finalized a rule that applies a new formula for calculating FTEs consistent with the *Hershey* decision. *Id.* at 49,066–72. CMS stated, "[a]fter reviewing the statutory language regarding the direct [graduate medical education] [full-time equivalent] cap and the court's opinion [in *Hershey*]," the agency decided to "implement a modified policy to be applied prospectively for all teaching hospitals, as well as retroactively to the providers and cost years in *Hershey* and certain other providers." *Id.* at 48,784.

36.    The modified policy determines a hospital's allowable weighted FTEs by comparing the FTE cap to the current-year unweighted and weighted FTEs. If the weighted and unweighted FTEs both exceed the FTE cap, the allowable weighted FTEs will equal the FTE cap. FY 2023 Final Rule, 87 Fed. Reg. at 49,072, 49,406 (revising 42 C.F.R. § 413.79(c)(2)(iii) (2022)). If the weighted FTEs do not exceed the FTE cap, the allowable weighted FTEs will equal the actual weighted FTEs. *Id.* Moreover, CMS found "good cause" to promulgate the new

rule retroactively to cost reporting periods starting on or after October 1, 2001.  FY 2023 Final

Rule, 87 Fed. Reg. at 49,069; 42 C.F.R. § 413.79(c)(2)(iii) (2022).

**V.      The DGME Managed Care Payment**

37.      The Medicare statute also makes a DGME payment to hospitals that treat MA

(Medicare Part C) patients.  42 U.S.C. § 1395ww(h)(3)(D).  The DGME managed care payment

is calculated by multiplying a hospital's "aggregate approved amount" times the ratio of MA

days to total days during the cost reporting period.  *Id.* § 1395ww(h)(3)(D)(i), (h)(3)(A)(i)-(ii).

38.      Medicare makes an additional payment to hospitals that receive reimbursement

for nursing and allied health programs and that treat MA patients.  *Id.* § 1395ww(l).  The nursing

and allied health managed care payment is funded by an annual percentage reduction to DGME

managed care payments.  *Id.* § 1395ww(h)(3)(D)(iii).

39.      CMS first implemented the nursing and allied health managed care payment and

corresponding DGME reduction in 2000.  Medicare Program; Provisions of the Balanced Budget

Refinement Act of 1999, 65 Fed. Reg. 47,026, 47,038-30 (Aug. 1, 2000).  CMS calculated a

10.5% percentage reduction to DGME managed care payments for calendar year 2000.  *Id.* at

47,039.  CMS also stated that it would publish updated percentages each year.  *Id.*  On May 23,

2003, CMS issued Transmittal A-03-043, which announced a DGME managed care reduction

percentage of 14.13% for calendar year 2001.  CMS did not update this percentage until 2020.

Before 2020, DGME managed care payments were reduced by 14.13%.

40.      On April 30, 2020, CMS issued Transmittal 16.  CMS, Transmittal 16 (Apr. 30,

2020), https://www.cms.gov/files/document/r16p240.pdf.  The Transmittal changed hospital cost

report Worksheet E-4 by adding two columns to the DGME MA payment calculation to

determine separate percentage reductions for cost reporting periods that do not align with the

calendar year, and it also added a new line 29.01 for hospitals to enter those percentages. Transmittal 16 also updated the percentage reductions to DGME MA payments for calendar years 2010 through 2018.  Transmittal 16, at 306.  The percentages are all lower than 14.13%. CMS thus acknowledges that teaching hospitals that receive DGME MA payments have been underpaid from calendar years 2010 through 2018.

41.    On December 14, 2020, CMS issued a transmittal correcting the DGME MA reduction factors for calendar years 2002 through 2018 (in each case, to a percentage far below 14.13) and directed its Medicare contractors to reopen cost reports that were settled within three years of the transmittal to apply the corrected reduction factor.   CMS, Transmittal 10520 (Change Request 11642) (Dec. 14, 2020), https://www.cms.gov/files/document/r10520otn.pdf. Change Request 11642 states that DGME managed payments should be reduced by 7.16% in calendar year 2012 and 6.41% in calendar year 2013.  *Id.* at 15.

## FACTS SPECIFIC TO THIS CASE

42.    Michigan Medicine trained residents in its fiscal year ending June 30, 2012 ("FY 2012").  Accordingly, the MAC established DGME FTE caps based on Michigan Medicine's FY 2012 resident FTE counts.

43.    On March 10, 2017, the MAC issued an NPR for Michigan Medicine's fiscal year ending June 30, 2012.

44.    On September 5, 2017, Michigan Medicine timely appealed the FY 2012 NPR to the Board, and the Board assigned case number 18-0958 to the appeal.  On November 2, 2017, Michigan Medicine timely added the issue of the "GME Cap Penalty" (hereinafter referred to as the "DGME Fellows Penalty").  Michigan Medicine challenged CMS's pre-2022 regulation at 42 C.F.R. § 413.79(c)(2)(iii), which impermissibly reduced Michigan Medicine's weighted count of

full-time-equivalent ("FTE") residents on cost report Worksheet E-4, line 9.  By letter dated July 5, 2018, Michigan Medicine transferred the DGME Fellows Penalty issue to a group appeal, PRRB Case No. 18-1241G.

45.     On June 27, 2019, the providers in Case No. 18-1241G requested that the Board grant expedited judicial review ("EJR") of the DGME Fellows penalty issue.  On July 26, 2019, the Board granted EJR, and on September 6, 2019, Michigan Medicine, along with several other hospitals, sought judicial review of 42 C.F.R. § 413.79(c)(2)(iii).  *Milton S. Hershey Med. Ctr. v. Becerra*, No. 1:19-cv-02680 (D.D.C. filed Sept. 6, 2019).  The plaintiff hospitals argued that the regulation "unlawfully reduces Plaintiffs' DGME payments."  Complaint ¶ 1, *Milton S. Hershey Med. Ctr. v. Becerra*, No. 1:19-cv-02680; *see also id.* ¶ 49.  The Plaintiffs requested "[a]n order from this Court requiring the Secretary to recalculate Plaintiffs' DGME payments consistent with the Medicare statute so that the Plaintiffs' FTE counts are weighted for residents beyond the IRP at 0.5 and are capped based on the number of residents trained in the most recent cost reporting periods ending on or before December 31, 1996."  *Id.* at 18.

46.     The court agreed with Michigan Medicine and its co-plaintiffs, and on May 17, 2021, the court granted the plaintiffs' motion for summary judgment.  This Court held "that Defendant's application of the regulation to compute Plaintiffs' full-time equivalent residents was contrary to law because the regulation effectively changed the weighting factors statutorily assigned to residents and fellows."  *Milton S. Hershey Med. Ctr. v. Becerra*, 2021 WL 1966572 (D.D.C.).  Accordingly, the court issued the following order:  "The case is hereby REMANDED to Defendant, who shall, as promptly as practicable in a manner consistent with the Court's Opinion, recalculate Plaintiffs' DGME payments."  Order, *Milton S. Hershey Med. Ctr. v. Becerra*, No. 1:19-cv-02680.

47.     On remand, the MAC recomputed Michigan Medicine's DGME payments without updating Worksheet E-4.  Instead, the MAC prepared a workpaper to recalculate Michigan Medicine's DGME payment attributable to Medicare Parts A and B.  The MAC then applied the revised payments, as calculated in the workpaper, as "other adjustments" on Worksheet E, Part A, line 70 and Worksheet E, Part B, line 39.  The amounts on the MAC's workpaper were color coded to indicate whether the MAC input those figures or calculated them.  Yellow denotes a number that the MAC input.  Blue denotes a number that the MAC calculated, and green denotes a number that the MAC calculated using the revised methodology from the FY 2023 Final Rule.

48.     Line 29.01 of the workpaper contains the DGME MA reduction percentage.  The MAC coded this yellow, indicating that the MAC input that figure, which is the incorrect and unlawful percentage of 14.13.  Line 30 of the workpaper contains DGME MA reduction and was coded blue, denoting that the MAC calculated that amount.  Line 30 of the workpaper calculated a DGME MA reduction of $675,164.

49.     Prior to the *Hershey* remand, Michigan Medicine's Worksheet E-4, line 30 applied a DGME MA reduction of $580,470.  The post-remand worksheet therefore increased the DGME MA reduction from $580,470 to $675,164, which was an additional reduction of $94,694.

50.     On October 17, 2022, the MAC issued an RNPR, which recalculated DGME payments using the revised 42 C.F.R. § 413.79(c)(2)(iii) (2022) and the incorrect DGME MA reduction.

51.     Michigan Medicine appealed the October 17, 2022, RNPR on April 17, 2023.  Michigan Medicine expressed dissatisfaction with the MAC's RNPR by appealing the following

14

issue: "Whether the Medicare Administrative Contractor ('MAC') improperly reduced the Provider's direct graduate medical education ('DGME') managed care payment by using an inaccurate and overstated reduction percentage."

52.    Michigan Medicine estimated that the reimbursement impact of the MAC's error was $4,565,863.

53.    On May 13, 2026, the Board dismissed Michigan Medicine's FY 2012 appeal. The Board conceded that the MAC adjusted the DGME MA payment reduction but nonetheless dismissed the appeal:

> The court order remanding Provider's case specifically required a recalculation based on the DGME Fellows Penalty Issue. The RNPR in this case was issued to implement a revision specific to that issue. The audit adjustment accompanying the RNPR shows the adjustment was related to that issue. The sole issue in this appeal, however, relates to a different DGME Part C Payment Reduction issue. It may be true that the DGME Part C Payment Reduction *amount* changed following the DGME Fellows Penalty Issue revisions, this was incidental and did not change or specifically adjust the actual DGME Part C Payment Reduction *percentage* (which is the basis for the appeal). Since appeals from RNPRs are limited in scope to those issues specifically adjusted, the Board finds it is appropriate to **dismiss** the DGME Part C Payment Reduction issue. Since this is the only issue in the appeal, the Board hereby closes the case and removes it from its docket.

54.    The Board's May 13, 2026 decision constitutes the Secretary's final agency action.

## COUNT I
## VIOLATIONS OF THE MEDICARE STATUTE GOVERNING BOARD APPEALS

55.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth below.

56.    The Medicare statute entitles a hospital to a hearing before the Board if the hospital is dissatisfied with the MAC's final determination, the amount in controversy is at least

15

$10,000, and the hospital requests a hearing within 180 days of receiving the MAC's determination.  42 U.S.C. § 1395oo(a).

57.    Plaintiff is entitled to a hearing to contest its FY 2012 DGME MA payments because Plaintiff was dissatisfied with the MAC's final determination, the amount in controversy exceeded $10,000, and Plaintiff appealed the October 17, 2022, RNPR within 180 days.  The Secretary's dismissal of Plaintiff's FY 2012 appeal violates provisions of the Medicare Act governing Board proceedings.  *Id.*

## COUNT II
## VIOLATIONS OF THE SECRETARY'S REGULATIONS

58.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth below.

59.    The regulation governing an appeal of an RNPR entitles a hospital to appeal "any matter" that is altered in an RNPR.  42 C.F.R. § 405.1889(b).  The MAC's October 17, 2022, RNPR revised the "matter" of the DGME MA reduction.  Because the MAC did not correctly adjust the DGME MA reduction for FY 2012, Plaintiff is entitled to appeal to the Board.  The Secretary violated the regulation at 42 C.F.R. § 405.1889 by improperly dismissing Plaintiff's appeal.

## COUNT III
## ARBITRARY AND CAPRICIOUS AGENCY ACTION

60.    Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth below.

61.    The regulation governing an appeal of an RNPR entitles a hospital to appeal "any matter" that is revised in an RNPR.  *Id.* § 405.1889(b).  The Secretary's dismissal of Plaintiff's FY 2012 appeal improperly limited the Board jurisdiction and was, therefore, arbitrary,

capricious, an abuse of discretion, and otherwise contrary to law, in contravention of the APA.  5

U.S.C. § 706(2)(A).

**RELIEF REQUESTED**

**WHEREFORE**, Plaintiff respectfully requests relief as follows:

1.      A declaration by the Court that the Board's decision is legally invalid and should

be set aside as arbitrary, capricious, an abuse of discretion, not based upon substantial evidence,

and not in accordance with the law.

2.      A declaration by the Court that the Board's failure to take jurisdiction over

Plaintiff's FY 2012 appeal is arbitrary, capricious, an abuse of discretion, not based upon

substantial evidence, and not in accordance with the law.

3.      An order from this Court requiring the Board to take jurisdiction over Plaintiff's

FY 2012 appeal.

4.      An order from this Court requiring the Secretary to pay Plaintiff interest on the

payments resulting from the Court's orders, pursuant to 42 U.S.C. § 1395oo(f)(2).

5.      An order from this Court awarding Plaintiff the costs and fees incurred in this

litigation and granting such other relief in law and/or equity as this Court may deem just and

proper.

Respectfully submitted,

*/s/ Ronald S. Connelly*
Ronald S. Connelly
D.C. Bar No. 488298
POWERS PYLES SUTTER & VERVILLE, PC
1250 Connecticut Ave. N.W., 8th Floor
Washington, DC 20036
T: (202) 466-6550
Ron.Connelly@PowersLaw.com
Attorney for Plaintiff

Dated:  July 13, 2026

17